**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:22-cr-00051-CEA-CHS |
| v. | ) | |
| | ) | |
| MICHAEL SHANE DYER | ) | |

**REPORT AND RECOMMENDATION**

**I.      Introduction**

This matter is before the Court upon Defendant Michael Shane Dyer's Motion to Suppress [Doc. 27] which the District Court has referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)-(C). On January 26, 2022, police executed a search warrant at Defendant's home in Marion County, Tennessee. Defendant seeks to suppress evidence found during the search of his home. Defendant was granted a hearing in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978), to examine whether a false statement was included in the search warrant affidavit either knowingly or in reckless disregard for the truth. For the reasons stated herein, it is **RECOMMENDED** that: (1) the search warrant **BE VALIDATED** under *Franks*; and (2) Defendant's motion to suppress **BE DENIED**.

**II.      Facts**

On January 21, 2022, Agent Charlie Rittenberry applied for a search warrant. The affidavit supporting probable cause contained the following facts:

1.  In the past 72 hours your Affiant utilized a confidential source ("CS") to purchase methamphetamine from [Defendant] at his residence at 932 Sequatchie Mountain Rd, Sequatchie, TN.
2.  Prior to the purchase, agents met the CS at an undisclosed meeting location and provided the CS with pre-recorded confidential funds and a covert audio monitoring device.
3.  Agents checked the CS and the CS's vehicle for any preexisting contraband and had negative results.

4. Agents followed the CS to [Defendant's] residence and monitored the CS pull in the driveway.
5. Agents monitored the CS during the controlled purchase via live audio monitoring have [a] conversation with [Defendant] regarding purchasing methamphetamine.
6. Agents monitored the CS leave [Defendant's] residence and then followed the CS to an undisclosed meeting location for debriefing and recovered the methamphetamine purchased.
7. The CS stated that [Defendant] had more methamphetamine in the residence than what he sold the CS. Agents corroborated the CS's debriefing with what was heard on live audio monitoring.
8. The methamphetamine purchased from [Defendant] was consistent in appearance with other methamphetamine your Affiant has encountered and tested positive for methamphetamine with Tru Narc drug identifier.
9. [Defendant] has 4 prior Tennessee Felony Drug Convictions as well as a Felon in possession of a firearm conviction.
10. 932 Sequatchie Mountain Rd is the address listed with Marion County Sheriff's Department and Marion County Court Clerk as [Defendant's] address.

[Doc. 27-1 at 3].

Additionally, Exhibit B attached to the search warrant application contained coordinates

for the specific residence to be searched, a picture of the residence to be searched, and the

following description:

> Target residence: 932 Sequatchie Mountain Rd, Sequatchie, TN
>
> Starting at the intersection of Valley View Hwy and Sequatchie Mountain Road, travel Northwest on Sequatchie Mountain Rd approximately 0.84 miles. The driveway to the target residence will be on the right-hand side of the road. Take the gravel/dirt driveway approximately 300 yards until reaching the target residence in a wooded area. The residence is a cabin style home with brown wooden log siding. A picture of the target residence will be posted below.
> The 911 address to the property shares a driveway with another residence.
> The below listed GPS coordinates more specifically identifies the location of the residence to be searched.

[Doc. 27-1 at 7].

When agents executed the warrant on January 26, 2022, they found "684.2 grams of 96%

pure methamphetamine, four guns, and $1,807.00 in United States currency." [Doc. 32 at 3].

On April 4, 2023, Defendant filed a Motion for *Franks* Hearing [Doc. 51] which was granted via Order [Doc. 59] dated June 6, 2023. A *Franks* Hearing was held August 22, 2023. [Docs. 83-85].

## III.    Standard of Review

Defendant claims that the search warrant affidavit contains a false statement that undermines probable cause. *See generally*, [Docs. 51, 86]. "Under *Franks*, a search warrant is invalid when the supporting affidavit contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth." *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014) (citation omitted). Defendant bears the burden of proof by a preponderance of the evidence. *Franks*, 438 U.S. at 155-56.

If a defendant fails to invalidate probable cause via *Franks*, he can, nevertheless, argue that the search warrant affidavit was insufficient to establish probable cause. *See generally* [Docs. 27, 38]. When a search warrant affidavit is challenged, "[w]ith great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021). "The critical element in a reasonable search is . . . that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). "Courts should review the sufficiency of an affidavit underlying a search warrant in a commonsense, rather than hypertechnical, manner. *United States v. Miller*, 314 F.3d 265, 269 (6th Cir. 2002). Additionally, an "affidavit is judged on the adequacy of what it does contain, not on

what it lacks, or on what a critic might say should have been added." United States v. Thomas, 605 F.3d 300, 309 (6th Cir. 2010).

## IV.    Discussion

### A.    False Statement under *Franks*

Defendant claims Agent Rittenberry misled the issuing magistrate[1] either knowingly, or with reckless disregard for the truth, by claiming Defendant's residence was located at 932 Sequatchie Mountain Road. [Doc. 86 at 5-9]. Defendant's claim is unavailing.

Agent Rittenberry stated in the search warrant affidavit that Defendant's residence was 932 Sequatchie Mountain Road. [Doc. 27-1 at 3]. Agent Rittenberry testified that he used "932" as the address number based on the Marion County Court Clerk's records, Marion County jail records, and Google Maps.[2] (Tr. 79-83[3]). But testimony at the *Franks* hearing established that 932 Sequatchie Mountain Road is the address for Defendant's mother, whose residence shares a driveway with Defendant's residence. *Id.* at 45. However, in the attached "Exhibit B" to the search warrant application, Agent Rittenberry clearly stated that the "911 address to the property shares a driveway with another residence." [Doc. 27-1 at 7]. At the time he prepared the search warrant affidavit, Agent Rittenberry thought that 932 Sequatchie Mountain Road was the address for the property that contained both residences. (Tr. 81-84). He testified that, based on his experience, it is common in rural counties to have an address with more than one residence on the property. *Id.* at 82. Accordingly, he included turn-by-turn directions, a picture of Defendant's residence, a

---

[1] In this case, the "issuing magistrate" was a General Sessions Court Judge for Marion County, Tennessee.
[2] Agent Rittenberry testified at the *Franks* hearing that "when I did a Google Map search of 932, it actually dropped a pin on the property where we did the controlled buy. It just did not drop a pin off directly on top of either one of the residences." (Tr. 83). The Court notes that Agent Rittenberry testified at a hearing on December 21, 2022, that based on the GPS and audio monitoring, the controlled buy took place near Defendant's residence, "all the way up" the driveway. [Doc. 36 at 12-14]. It did not take place near the other residence, belonging to Defendant's mother, that shared the same driveway. Her residence is located down the hill much closer to Sequatchie Mountain Road. (Tr. 14-38, 45-60).
[3] The *Franks* hearing transcript is found in the Court record at [Doc. 85].

physical description of Defendant's residence, and GPS coordinates for Defendant's residence in "Exhibit B" to the application for search warrant so there would be no mistake as to which of the two residences at the property was being referenced. *Id.* at 81-84.

Based on the evidence at the *Franks* hearing, the Court finds that the turn-by-turn directions, picture, physical description, and GPS coordinates all were accurate. Thus, the issuing magistrate was not materially misled by the inclusion of the address number "932 Sequatchie Mountain Road." Further, Agent Rittenberry clearly used "932" as but one of many descriptors in an effort to accurately describe a particular residence in a remote and potentially confusing rural area. Therefore, when viewed in appropriate context, the inclusion of the descriptor "932 Sequatchie Mountain Road" was neither intentionally nor recklessly misleading.

Defendant makes a second claim regarding the truthfulness of Agent Rittenberry's written statement, *to wit*, "[t]he 911 address to the property shares a driveway with another residence." Defendant claims that this statement misled the issuing magistrate to believe that Agent Rittenberry had "consulted the 911 system for the street address." [Doc. 86 at 6]. Defendant further claims that this statement represents, at the very least, reckless disregard for the truth because Agent Rittenberry did not consult the 911 system to obtain the 932 Sequatchie Mountain Road address. *Id.*

The Court notes that, based on his testimony at the *Franks* hearing, Agent Rittenberry understood the phrases "911 address" and "street address" to mean the same thing. *See* (Tr. 225-32). To the extent Agent Rittenberry's own internal thought process is the measure, the Court concludes that he did not possess an intent to mislead. That said, the Court acknowledges that using the phrase "911 address" could have misled the issuing magistrate to assume that the 911 system had been used to verify the address when, in fact, it had not been used. (Tr. 232). Based on

the testimony of the executive director for Marion County 911, the 911 system would not have given Agent Rittenberry the address 932 Sequatchie Mountain Road as the address for Defendant's residence.[4] (Tr. 181-209). However, assuming *arguendo* that Agent Rittenberry's use of the phrase "911 address" was false and reckless, Defendant still must show that use of such phrase was necessary for a finding of probable cause. *Franks*, 438 U.S. at 155.

For the sake of argument, the Court will omit the reference to the "911" system—as well as all specific references to the "932 Sequatchie Mountain Road" street address—since a check with the actual 911 system would have given Agent Rittenberry a different response to his query. The Court will also omit the phrase "to [Defendant's] residence" in paragraph 4 as briefly[5] argued by Defendant. *See* [Docs. 51 at 4; 86 at 7]. Finally, the Court will omit the turn-by-turn directions and the physical description of Defendant's residence insofar as they are inconsistent with Paragraph 8 of Defendant's Affidavit [Doc. 58].[6] With these omissions, the hypothetical search warrant affidavit ("hypothetical affidavit") would read:

1. In the past 72 hours your Affiant utilized a confidential source ("CS") to purchase methamphetamine from [Defendant] at his residence at Sequatchie Mountain Rd, Sequatchie, TN.
2. Prior to the purchase, agents met the CS at an undisclosed meeting location and provided the CS with pre-recorded confidential funds and a covert audio monitoring device.

---

[4] However, to illustrate the rural-confusion point made above, even in the executive director's testimony there was ample confusion on basic issues of identification regarding the parcels and addresses in question. Additionally, the executive director testified that, at the time prior to the issuing of the search warrant, the 911 system would have returned the wrong address for Defendant's mother's residence, no address for Defendant's residence, and an incorrect location for the address 932 Sequatchie Mountain Road. *See* (Tr. 181-209). He further testified that if someone had asked him about the address to Defendant's residence, he would have noticed that something was wrong and would have gone out to the area in question to investigate things because "we've got a problem here." (Tr. 206-08).

[5] The Court notes that Defendant's brief treatment of this issue is appropriate considering the Court's discussion on the subject in the Order [Doc. 59] granting the *Franks* hearing, the Government's lack of argument on the matter, and the overwhelming proof in Defendant's favor. The Court is similarly brief on the issue but notes that the evidence did not show that the use of the word "residence" in paragraph 4 was intentional, but rather reckless. During the *Franks* hearing witnesses and attorneys used residence and property interchangeably, even when they were not meaning to.

[6] The Court does not accept Defendant's affidavit as true, especially since evidence at the *Franks* hearing expressly contradicted portions of it (especially, but not exclusively, paragraph 9). The Court is merely engaging in a hypothetical exercise with axioms favorable to Defendant.

3.  Agents checked the CS and the CS's vehicle for any preexisting contraband and had negative results.
4.  Agents followed the CS and monitored the CS pull in the driveway.
5.  Agents monitored the CS during the controlled purchase via live audio monitoring have [a] conversation with [Defendant] regarding purchasing methamphetamine.
6.  Agents monitored the CS leave [Defendant's] residence and then followed the CS to an undisclosed meeting location for debriefing and recovered the methamphetamine purchased.
7.  The CS stated that [Defendant] had more methamphetamine in the residence than what he sold the CS. Agents corroborated the CS's debriefing with what was heard on live audio monitoring.
8.  The methamphetamine purchased from [Defendant] was consistent in appearance with other methamphetamine your Affiant has encountered and tested positive for methamphetamine with Tru Narc drug identifier.
9.  [Defendant] has 4 prior Tennessee Felony Drug Convictions as well as a Felon in possession of a firearm conviction.

Additionally, Exhibit "B" to the hypothetical affidavit would contain a picture of

Defendant's residence and read:

Target residence: Sequatchie Mountain Rd, Sequatchie, TN

Starting at the intersection of Valley View Hwy and Sequatchie Mountain Road, travel Northwest on Sequatchie Mountain Rd approximately 0.84 miles. The driveway to the target residence will be on the right-hand side of the road. A picture of the target residence will be posted below.
The address to the property shares a driveway with another residence.
The below listed GPS coordinates more specifically identifies the location of the residence to be searched.
LAT: 35.120950
LON: -85.606261.[7]

In this exercise, the hypothetical affidavit identifies a controlled buy of methamphetamine

(the methamphetamine having been confirmed by a field test) from Defendant by the CS at

Defendant's residence within the previous 72 hours. There is a report from the CS of an additional

quantity of methamphetamine in the residence corroborated by live audio monitoring. Finally,

---

[7] The Court notes that the precision of GPS coordinates with six decimal places, such as in Exhibit "B" here, is measured in millimeters. *See* chart: Degree precision versus length, https://www.quadrant.io/resources/location-data.

there is a photograph of Defendant's residence pinpointing its location through GPS coordinates specific to six decimal places.

In *United States v. Jackson*, a controlled buy was executed at a residence by a confidential source within three days of the search warrant application. 470 F.3d 299, 303 (6th Cir. 2006). The transaction was audio monitored and the purchased substance field-tested positive for cocaine. *Id.* The facts in *Jackson* are analogous to those presented in the instant case—including the fact that the affidavit in *Jackson* contained no information about the reliability of the CS other than the controlled buy. *See id.* Defendant argues that a body of facts similar to those contained in the hypothetical affidavit do not provide enough "information about the reliability of the CS" to support probable cause. [Doc. 86 at 3]. However, the Sixth Circuit has found that reliability may sometimes be satisfied through a single controlled buy. *See United States v. Henry*, 299 Fed. App'x 484, 486-88 (6th Cir. 2008) (collecting cases, including *Jackson*). Indeed, based upon *Jackson* and the many cases collected in *Henry*, the Court finds that the controlled buy in the present case was sufficient to satisfy the reliability requirement. A more thorough analysis of reliability may be found below in Section IV.B.2.

The Court concedes, however, that there are facts in *Jackson* that differ from those in the instant case. In *Jackson*, the affidavit stated, "Affiant observed [the] informant going into this residence before making [the] transaction." In the present case, the CI was not observed entering Defendant's residence. Instead, the hypothetical affidavit recites that audio monitoring corroborates the report by the CS that there is yet "more methamphetamine in the residence." The Sixth Circuit has made clear that "[t]here must be . . . a nexus between the place to be searched and the evidence sought. *Unites States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). In *Jackson*, the visual monitoring helped establish that nexus. In the present case, the Court finds that the verbal

report by the CS corroborated by audio monitoring serves the same function. Though it is unclear from the hypothetical affidavit whether the controlled buy took place inside the residence or not, the corroborated statement from the CS that "[Defendant] had more methamphetamine in the residence than what he sold the CS" connects the evidence sought to Defendant's residence.

Another point of contention in the present case is the fact that two residences—Defendant's residence and his mother's residence—shared a common driveway. The question is presented whether the shared driveway deprives the hypothetical affidavit of sufficient specificity to tie Defendant's residence—as opposed to his mother's residence—to the controlled buy of methamphetamine. The Court finds that sufficient specificity exists to establish the required nexus. Significantly, the exhibit attached to the hypothetical affidavit contains both a photograph[8] and extremely precise GPS coordinates pinpointing Defendant's residence. Moreover, paragraph 6 of the affidavit states that the CS was monitored leaving *Defendant's* residence. Agent Rittenberry testified that the audio monitor placed on the CS contained a GPS tracker which was used to ensure that the CS went to the residence corresponding to the GPS coordinates listed in the affidavit (the Defendant's residence), and not Defendant's mother's residence. (Tr. 95-113). In other words, by observing the GPS tracker on a device screen in real time, Agent Rittenberry was able to observe the movement of the CS to and from the GPS coordinates that accurately pinpointed Defendant's residence. The Court finds that there is no ambiguity as to which residence on the shared driveway is connected to the controlled buy, and that a sufficient nexus was established between the controlled buy of methamphetamine and Defendant's residence.

---

[8] The photograph in the record prior to the *Frank's* hearing was of limited utility due to being grayscale and of relatively poor quality. *See* [Doc. 27-1 at 7]. However, at the *Frank's* hearing, the General Sessions Court Judge who signed the affidavit testified and brought his original copy of the search warrant application. (Tr. 145-48). Government's Exhibit 15 is a color copy of the issuing judge's original. (Tr. 148-49). Because the photograph is in color and of higher quality, it is of greater utility than its predecessor in the record.

Consequently, the Court finds that—after omitting certain facts from the original search warrant affidavit which Defendant contests on the basis of accuracy and reliability—the pared down "hypothetical affidavit" still clears the low bar of probable cause by connecting the "things" sought to Defendant's residence. Therefore, inclusion of the phrase "911 address," as well as the street address number "932 Sequatchie Mountain Rd," in the search warrant affidavit were not necessary for a finding of probable cause. For the reasons set forth above, the Court finds that Defendant has failed to show by a preponderance of the evidence that the search warrant is invalid under *Franks*.

## B.     Probable Cause without *Franks*

Defendant makes several claims in his Motion to Dismiss [Doc. 27] regarding the inadequacy of the search warrant affidavit to support probable cause. In addressing Defendant's arguments, the Court will ignore all subsequently developed evidence and will rely solely upon the four corners of the search warrant affidavit.

### 1.     Nexus Between Drug Activity and Defendant's Residence

Defendant asserts that "the affidavit does not provide a sufficient nexus between [Defendant] Mr. Dyer's home and the alleged drug activity." [Doc. 27 at 2]. A search warrant affidavit must show a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998)). In order "to meet the probable cause standard, an affidavit must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." *United States v. Jenkins*, 743 F. App'x 636, 642 (6th Cir. 2018). An "affidavit supporting a narcotics search warrant for a residence does not establish a nexus between a defendant's recent drug activity and his residence where the affiant did not provide direct

knowledge that the defendant has either sold drugs or used that particular residence for selling drugs." *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009).

Here, the affiant, Agent Rittenberry, did not rely solely on Defendant's status as a drug dealer to obtain a search warrant. Rather, he provided information that Defendant's residence was used for storing and/or selling drugs based on: (1) the utilization of the CS to buy methamphetamine; (2) the audio monitoring of the controlled buy; (3) the visual monitoring of the GPS tracker to confirm that the CS arrived at the specific GPS coordinates for Defendant's residence; and (4) the debriefing with the CS.

Defendant claims that because Mr. Dyer's home was in a wooded area at the end of a 300-yard driveway, "[o]fficers did not visually observe the alleged transaction, and therefore cannot say where on the property the drug sale may have occurred. [Doc. 27 at 2]. However, as noted above, even if the actual drug transaction occurred outside the residence, the CS stated that Defendant had more methamphetamine in the residence. [Doc. 27-1 at 3]. This statement was corroborated by law enforcement's audio monitoring of the controlled buy. *Id.* The CS may have learned that Defendant had more methamphetamine in the residence through direct observation or through conversation with Defendant. Either way, law enforcement learned that Defendant was storing illicit drugs at his residence. And of course, this direct connection between methamphetamine and the residence was in addition to law enforcement's knowledge that Defendant had four previous felony drug convictions and that he had just sold methamphetamine to the CS.

Defendant cites to seven cases, using specific facts from each case to show how the instant case has even less of a nexus than each cited case. *See* [Doc. 27 at 3-4] (citing *United States v. White*, 874 F.3d 490 (6th Cir. 2017), *United States v. Lamon*, 930 F.2d 1183 (7th Cir. 1991), and

*United States v. Brown*, 828 F.3d 375 (6th Cir. 2016)) and [Doc. 38 at 3-4] (citing *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), *United States v. McPherson*, 469 F.3d 518 (6th Cir. 2006), *United States v. Lingo*, 2021 WL 75006 at *3 (6th Cir., January 8, 2021) (unreported), and *United States v. Grant*, 2023 WL 119399 at *1 (6th Cir., January 6, 2023) (unreported)). However, "whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented." *Brown*, 828 F.3d at 382. The Court finds that in each of the seven cases cited, some facts are more favorable to Defendant and some facts are more favorable to the Government. *Compare, e.g.,* [Doc. 27 at 3-4] *and* [Doc. 38 at 3-4] *with* [Doc. 32 at 13-16] *and* [Doc. 39 at 3]. The nexus question is not neatly resolved by the seven cited cases due to the precise constellation of facts in this case.

"[T]here is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home." *United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009); *see also Grant*, 2023 WL 119399, at *3 (6th Cir. Jan. 6, 2023) (unreported) ("At a minimum, we have required "facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." (quoting *Brown*, 828 F.3d at 383)). Here, Defendant's status as a drug dealer coupled with the controlled buy at or near his residence and the information from the CS that there was more methamphetamine in the residence meets the nexus requirement for searching Defendant's home.

## 2. Reliability of the CS

Defendant argues that "[t]he search warrant in the present case contains absolutely no information about the reliability of the confidential source used to conduct the alleged drug transaction at [Defendant's] residence." [Doc. 27 at 4].

An "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Thomas*, 605 F.3d 300, 309 (6th Cir. 2010). "[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *Jackson*, 470 F.3d 299, 307 (6th Cir. 2006). Reliability based on prior contacts is not required; an affiant's personal knowledge and observations through the monitoring of a controlled purchase may strongly contribute to sufficient corroboration. *See United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012); *United States v. Coffee*, 434 F.3d 887, 892-95 (6th Cir. 2006); *Jackson*, 470 F.3d at 307-08; *United States v. Pinson*, 321 F.3d 558, 563 (6th Cir. 2003).

Here, the affidavit contained personal knowledge and observations of the affiant through the "pre-recorded confidential funds," confirmation of a lack of "preexisting contraband," tracking "the controlled purchase via live audio monitoring," and "follow[ing] the CS to an undisclosed meeting location for debriefing and recover[ing] the methamphetamine purchased." [Doc. 27-1 at 3]. Under the totality of the circumstances, there was sufficient corroboration for the reliability of the CS to support probable cause. This conclusion is supported by numerous Sixth Circuit cases, especially *Jackson*, as noted above in Section IV.A.

### 3.      Staleness of the Controlled Buy

Defendant argues that the passage of eight days was "[a] significant delay between the controlled buy and execution of the search warrant." [Doc. 27 at 6]. Defendant relies on *United States v. Hython*, 443 F.3d 480, (6th Cir. 2006) to show how this "staleness" contributed to a lack of probable cause. *Id.*

In *Hython*, the affidavit: (1) "did not establish [the residence] was the secure operational base for an ongoing drug enterprise"; and (2) "[m]ore importantly . . . offer[ed] no clue as to when [the] single controlled buy took place." 443 F.3d at 486. As to the first point, *Hython* primarily involved a controlled buy where "a confidential informant gave pre-recorded buy money to an unidentified female, who was followed to the address in question, observed entering and leaving, and who later delivered a baggie of crack cocaine to the confidential informant." *Id.* Here, the controlled buy took place at or very near the residence, and the CS reported that there was more methamphetamine in the residence. As to the second and more important point, the affidavit here was clear that the controlled buy occurred within 72 hours of the application for the search warrant. Therefore, *Hython* is not persuasive on the issue.

The Sixth Circuit has upheld delays in executions of search warrants in other cases where the delay was equal to or greater than the delay here. *See United States v. Lemmons*, 527 F.2d 662 (6th Cir. 1975); *United States v. Wilson*, 491 F.2d 724 (6th Cir. 1974). In *United States v. Richmond*, the Sixth Circuit emphasized that the key question when analyzing a delay in the execution of the warrant is "whether probable cause still existed at the time the warrant was executed." 884 F.2d 581 (1989).

Here, Defendant had a history of felony drug convictions, had sold methamphetamine to the CS, and the CS gave a corroborated report that even more methamphetamine was in Defendant's residence. Nothing in the record shows that probable cause was diminished by the delay. *See Lemmons*, 527 F.2d 662, 664 (1975) (finding delay was reasonable, in part, because "there is nothing in the record to indicate that the circumstances related in the agent's affidavit affording probable cause for the issuance of the search warrant had changed before it was

executed."). Therefore, the delay in executing the search warrant was reasonable and probable cause was not affected by the five-day delay between signing and executing the search warrant.

### 4. Good Faith Exception

Even if Defendant could show that the issuing judge's probable cause determination was improper, the *Leon*[9] good faith exception could apply. This exception requires courts to "ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (internal quotation omitted).

Defendant argues that the good faith exception should not apply. First, he claims his case is similar to *United States v. Barrington*, 806 F.2d 529 (5th Cir. 1986). Second, he claims the affidavit "was so bare bones as to preclude any reasonable belief in the search warrant." The Court will address each argument in turn, and will also analyze the good faith exception relative to the nexus discussion found above in Section IV.B.1.

### a. *Barrington*

Defendant claims that *Barrington* stands for the proposition that "an officer who submits an insufficient affidavit to the magistrate, and executes the warrant himself, could not have acted in objective good-faith reliance on the warrant." [Doc. 27 at 8]. And since Agent Rittenberry both submitted and executed the warrant, Defendant claims this renders the good faith exception inapplicable. *Id.*

The Court starts by noting the persuasive, but non-controlling nature of *Barrington*. The Court also notes that a general rule as stated by Defendant could conflict with the Supreme Court's statement in *Leon* that '[i]n the ordinary case, an officer cannot be expected to question the

---

[9] Under *United States v. Leon*, evidence should not be excluded if there was "objectively reasonable law enforcement activity," especially good faith reliance on a warrant. 468 U.S. 897, 919-20 (1984).

magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient." 468 U.S. at 898. Harmony is found in the details of both *Leon* and *Barrington* where Defendant's stated rule is not found applicable to the ordinary case, but is confirmed for certain situations involving a bare bones affidavit. *See Leon*, 468 U.S. at 898, 922 n. 24; *Barrington*, 806 F.2d at 532. Therefore, Defendant's claim under *Barrington* turns on whether this is a bare bones affidavit, as analyzed below.

### b.      Bare bones

A "bare bones" affidavit is one "so lacking in indicia of probable cause as to make an officer's belief in its existence objectively unreasonable." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (cleaned up). "We reserve that label for an affidavit that merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* (internal quotation omitted). A bare bones affidavit "is one which states only the affiant's belief that probable cause existed." *Id.*

Agent Rittenberry's affidavit provided some underlying factual circumstances, not just suspicions or conclusions. For instance, Defendant's felony drug convictions factually support that he had sold drugs in the past. The controlled buy by the CS factually supports that he was currently selling drugs. The statement by the CS that there was more methamphetamine in the residence factually supports that the controlled buy was not an isolated event and that Defendant's residence was involved. The corroboration of information from the CS through debriefing and audio monitoring supports reliability. The appearance and field-testing results of the purchased substance support that there was an illegal transaction involving methamphetamine. In short, the affidavit is not bare bones.

### c.    Nexus and good faith exception

Additionally, the Sixth Circuit has "previously found *Leon* applicable to cases where . . . the affidavit contained a *minimally sufficient* nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (emphasis added). "The affidavit need not establish a substantial basis, only some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018).

As noted above in Section IV.B.1, the Court finds that a sufficient nexus exists between Defendant's residence and the sale of methamphetamine to support probable cause. However, even if the nexus here was insufficient to support probable cause, the Court finds that the nexus meets the minimally sufficient standard required to support Agent Rittenberry's good faith belief in the warrant's validity for all the same reasons listed above.

## V.    Conclusion

For the reasons stated herein, it is **RECOMMENDED**[10] that the search warrant **BE VALIDATED** under *Franks* and that Defendant's Motion to Suppress [Doc. 27] **BE DENIED.**

    **ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified constitutes a forfeiture of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).